IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Deutsche Bank National Trust Company<br>As Trustee for American Home Mortgage<br>Corporation, | ) <br> ) <br> ) <br> ) | Case No. 2:11-cv-1659-DCN |
| Plaintiff, | ) <br> ) | |
| v. | ) <br> ) | **Defendant's Memorandum in Support of<br>Motion for Summary Judgment** |
| Stewart Title Guaranty Company, | ) <br> ) | |
| Defendant. | ) <br> ) | |

Pursuant to Local Civil Rule 7.04, Defendant Stewart Title Guaranty Company ("Stewart" or "Defendant") hereby respectfully submits this memorandum in support of its motion for summary judgment. Taking the evidence in the light most favorable to the Plaintiff, the record establishes that Defendant is entitled to judgment as a matter of law for the following alternative reasons:

1.     Plaintiff Deutsche Bank National Trust Company as Trustee for American Home Mortgage Corporation ("Deutsche Bank" or "Plaintiff") has no right to recover on the lender's title insurance policy issued by William R. Hearn, Jr., doing business as WRH Title Insurance Agency, because there is no third party claim being asserted with respect to the insured property.

2.     Plaintiff has no right to recover on the lender's title insurance policy issued by Hearn because the Plaintiff failed to pursue the debt secured by the subject mortgage by collecting on the note or by timely requesting a deficiency judgment against the borrowers. This failure not only negated the Plaintiff's right to recover under the policy but also prejudiced Stewart's subrogation rights.

3.	It is undisputed that the title insurance policy form issued by Hearn was an "oversight" that failed to conform to the intentions of the parties. The parties unequivocally agreed to include certain Standard Exceptions to coverage in the final title policy. These Standard Exceptions prevent recovery by the Plaintiff.

4.	As a matter of law, there is no duty by a title insurer to disclose purported title defects on a property to a lender. A title insurance policy is one of indemnity. It does not guarantee that there are no defects with the property, nor does it affirmatively represent the condition of the property. Instead, subject to the terms, conditions and exceptions of the policy, it insures against actual loss caused by a covered title insurance defect.

## Nature of the Case

On July 8, 2011, the Plaintiff filed the present lawsuit against Defendant seeking a declaratory judgment that a lender's title insurance policy underwritten by Defendant covered graves and burial sites purportedly located outside the boundaries of a platted cemetery on real property obtained by the Plaintiff during a foreclosure sale. **Entry 1.** Plaintiff also sought damages for Defendant's alleged breach of the policy, contractual bad faith, and bad faith failure to pay. **Entry 1.** On November 14, 2011, the Plaintiff filed an Amended Complaint asserting identical causes of action. **Entry 17.** Defendant answered, denying liability under the policy, raising several affirmative defenses, and counterclaiming for reformation of the policy to conform to the title insurance commitment. **Entry 6; Entry 18.** Plaintiff filed a reply to Defendant's counterclaim, denying the substantive allegations therein, and asserting affirmative defenses thereto. **Entry 8; Entry 21.**

## Statement of the Facts

This action involves a three acre parcel of real property located at 997 Harts Bluff Road on Wadmalaw Island, South Carolina (the "Property"). **Entry 17, ¶9.** The Property includes approximately 260 feet of frontage along the Wadmalaw River and rights to a joint-use dock located on the adjacent property. A two-story, single-family residence of approximately 831 square feet was constructed on the Property around 1993.

In early 2007, Marjorie E. Schramm and William O. Baker, who owned the Property at the time, sought to refinance their two existing loans secured by the Property. **Entry 17, ¶¶9-10.** Consequently, they obtained preliminary loan approval with American Home Mortgage Corporation ("Lender" or "AMH"). Schramm and Baker chose William R. Hearn, Jr., to act as the closing attorney on the refinance. **Ex. A, Hearn Dep., p.69:16-20.**

At the time, Hearn, doing business as WRH Title Insurance Agency, was authorized to issue title insurance binders, commitments and policies for Stewart, subject to the terms and conditions of his agreement with Stewart. **Ex. B, Hearn Retainer Agreement.** This agreement provides, in pertinent part: "No title policy shall be issued by ATTORNEY in excess of Five Hundred Thousand Dollars ($500,000.00) without first obtaining the written consent of STEWART." **Ex. B, Hearn Retainer Agreement.** Hearn was also not authorized to perform loan closings for Stewart: "ATTORNEY does not and shall not represent that ATTORNEY is closing the transaction on behalf of STEWART." **Ex. B, Hearn Retainer Agreement.** The Lender authorized Hearn to act as its agent during the closing. **Ex. C, Lender's Closing Instructions; Ex. A, Hearn Dep., pp.97:15-98:5.** *See also Doe Law Firm v. Richardson*, 636 S.E.2d 866, 868 (S.C. Sup. Ct. 2006) ("Real estate closings and mortgage loan closings should be conducted only under an attorney's supervision. The supervising attorney may represent both the lender and the borrower after full disclosure and with each party's consent.").

3

On or around January 22, 2007, AMH faxed a Request for Title Commitment to Hearn for a loan of $620,000.00, with closing to occur on February 15, 2007. **Ex. A, Hearn Dep., p.32:14-33:7; Ex. D, Request for Title Commitment.** On February 6, 2007, Hearn faxed a title insurance commitment to the Lender to issue a $560,000.00 A.L.T.A. Loan Policy (1992). **Ex. A, Hearn Dep. pp.49:2-50:2; Ex. E, Title Insurance Commitment.** This commitment required a mortgage securing the loan and the satisfaction of the two mortgages which encumbered the Property at the time. **Ex. E, Title Ins. Commitment.** This commitment also incorporated several "Standard Exceptions," in pertinent part:

> Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company:
>
> . . .
>
> b) Easements, or claims of easements, not shown by the public records;
>
> c) Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of the premises;
>
> . . . ; and
>
> f) Restrictions upon the use of the premises not appearing in the chain of title to the land.

**Ex. E, Title Ins. Commitment.** It is undisputed that Hearn did not have written authorization from Stewart to issue this commitment, which exceeded $500,000.00. **Ex. B, Hearn Retainer Agreement; Ex. A, Hearn Dep. p.59:2-9.** There is also no evidence that Hearn contacted anyone with Stewart to obtain such approval (or otherwise) at this time, or that anyone with Stewart even knew about the closing prior to afternoon of the day of closing. **Ex. A, Hearn Dep., pp.89:15-90:11.**

Hearn testified that, although the closing was scheduled to occur on February 15, 2007, the closing date was ultimately pushed up to February 9, 2007. **Ex. A, Hearn Dep. pp.43:20-44:13.** On February 9, 2007, Hearn realized he had never obtained written approval from Stewart to issue an over-limits title insurance policy, as required in his retainer agreement. **Ex. A, Hearn Dep. pp.109:21-110:9; Ex. C, Hearn Retainer Agreement.** As a result, at 12:07 p.m. on February 9, Hearn faxed an over-limits approval request to Barry Sloop, a Stewart representative in Columbia, South Carolina. **Ex. A, Hearn Dep. p.58:9-24; Ex. F, Overlimit Approval Request.** Hearn learned that Sloop was out of the office, so he called Sloop on Sloop's cell phone to alert Sloop of the request. **Ex. A, Hearn Dep. pp.61:18-62:21.**

Sloop was the familiar with the Property from a prior title insurance claim made by Schramm and Baker against Stewart based on graves and burial sites purportedly located outside of the platted cemetery on the Property. **Ex. G, Sloop Dep. Day 1, pp.30:19-31:16.** Schramm and Baker's claim resulted in litigation and, ultimately, a settlement in which Stewart paid Schramm and Baker $50,000.00. Sloop was told at the time of the settlement that the settlement and the facts relating thereto were subject to a confidential settlement agreement. **Ex. H, Sloop Dep., Day 2, p.14:13-22.**

When Hearn contacted Sloop by phone on the afternoon of February 9, 2007, Sloop expressed his familiarity with the Property to Hearn and explained that he would need to include certain exceptions in the commitment, which he would send to Hearn. **Ex. A, Hearn Dep., p.62:16-21.** Hearn testified that the specific exceptions were not discussed, nor was the prior litigation, during this phone conversation. **Ex. A, Hearn Dep., p.63:1-17.** Sloop testified that he did not discuss these issues because he believed the confidential settlement agreement prohibited him from doing so. **Ex. G, Sloop Dep., Day 1, p.85:11-25.** At 4:34 p.m., Sloop faxed a written

5

over-limits approval to Hearn, subject to certain exceptions, which were attached to the fax. **Ex. A, Hearn Dep., p.60:10-25; Ex. I, Overlimits Approval.** These included an exception for "[b]urial grounds and gravesites which may be located on subject property and easements running thereto." **Ex. I, Overlimits Approval.** Sloop testified that this exception was intended to place Hearn on notice of the prior issues associated with the Property without violating the confidential settlement agreement. **Ex. G, Sloop Dep., Day 2, p.89:5-23.** Sloop expected Hearn, as the Lender's closing agent, to discuss these additional exceptions with the Lender. **Ex. G, Sloop Dep., Day 2, p.89:5-23.** As Hearn explained during his deposition, this was the normal course of bringing a possible title insurance defect to the Lender's attention prior to closing. **Ex. A, Hearn Dep., pp.76:25-77:6.**

According to Hearn's deposition testimony, he did not wait to receive the written approval from Sloop with the added exceptions before closing the loan. **Ex. A, Hearn Dep. p.66:3-12.** Hearn believes the fax came in while he was conducting the closing. **Ex. A, Hearn Dep., p.66:3-12.** After the closing, Hearn issued a second title insurance commitment to the Lender, incorporating both the Standard Exceptions referenced above from the previous commitment and the additional exceptions required to be included by Sloop. **Ex. A, Hearn Dep. p.100:8-25; Ex. J, Title Insurance Commitment.** Hearn testified this title insurance commitment was sent to the Lender with the other closing documents after the closing. **Ex. A, Hearn Dep. p.103:2-5.**

Two months later, on April 17, 2007, Hearn issued and mailed a "short form" lender's title insurance policy to the Lender along with the recorded mortgage. **Ex. A, Hearn Dep. p.29:2-16; Ex. K, Cover Letter and Short Form Policy.** Hearn testified that the issuance of the short form policy was an "oversight" on his part. **Ex. A, Hearn Dep., p.109:4-12.** The Standard

6

Exceptions in the short form policy do not match the Standard Exceptions incorporated into both title insurance commitments previously issued by Hearn to the Lender. **Ex. K, Short Form Policy.** The short form policy issued by Hearn also failed to include the exceptions required by Sloop. **Ex. K, Short Form Policy.**

Plaintiff alleges that, in June 2008, Schramm and Baker ceased making payments on the note and mortgage. **Entry 17, ¶13.** Plaintiff filed a foreclosure action in the Charleston County Court of Common Pleas on September 9, 2008. **Entry 17, ¶14.** In or around November 21, 2008, the Plaintiff received a letter from William Baker indicating that the Property contained a large number of burial sites outside of the platted cemetery and could not be used as residential property. **Entry 17, ¶15.** It is undisputed that the Plaintiff failed to seek a deficiency judgment or pursue the note against the borrowers until they filed a post-trial motion after the foreclosure. The Plaintiff ultimately purchased the Property and satisfied the mortgage.

Plaintiff filed this action on July 8, 2011, seeking a judicial declaration that the policy issued by Hearn covers graves and burial sites outside of the platted cemetery on the Property. **Entry 1; Entry 17.** Plaintiff also asserted a breach of contract action against Defendant and actions for bad faith relating to the Defendant's purported failure to disclose a potential title defect before the closing and the Defendant's refusal to reimburse the Plaintiff for the alleged loss in value of the Property due to these alleged graves and burial sites. **Entry 1; Entry 17.** Defendant denied the substantive allegations of the Amended Complaint and sought to reform the policy to conform to the title commitment issued by Hearn to the Lender after the closing. **Entry 18.**

## Standard of Review

7

Summary judgment is appropriate where the Court finds "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. Proc. The judge is not to weigh the evidence but rather must determine if there is a genuine dispute for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Id.* at 327.

## Legal Argument

**I. Plaintiff failed to produce evidence sufficient to create a genuine dispute of material fact as to whether the Plaintiff suffered an actual loss under the policy from a third party claim.**

Plaintiff has confused title insurance with a guaranty of title. A mere title defect is not sufficient, in and of itself, to establish a title insurance claim. The Plaintiff in this case never notified Stewart before this litigation of any purported third party asserting rights to the Property. Instead, the Plaintiff filed this litigation to assert unknown third party rights, something which the insured is not permitted to do.

"A title policy indemnifies rather than guarantees the state of the insured title." *Lawyers Title Ins. Co. v. Synergism One Corp.*, 572 So. 2d 517, 518 (Fla. Dist. Ct. App. 1990). "The policy does not guarantee that litigation will not occur, but, in fact, assumes the opposite, that

8

many types of title defect litigation can occur." *Id.* "The insured's claim must await an adverse title determination by a court." *Id.* "The claim only lies once a court speaks, and not before, and not if the court's judgment is favorable." *Id.* (citation omitted).

The South Carolina Court of Appeals reiterated these principles in *First Fed. Sav. Bank of Brunswick v. Stewart Title Guar. Co.*, 451 S.E.2d 916, 921 (Ct. App. 1994), in which it quoted favorably from *Synergism*. In *First Fed.*, the owners of the insured property claimed they were not conveyed valid title to the premises and, as such, stopped making payments on their mortgage loans to the lender, First Federal. *Id.* First Federal notified the title insurer of the claim, and the title insurer brought suit against the owners to reform the deeds and cure the defects. *Id.* The Court held that the title insurer had the option to institute suit to cure the defects and, having done so, would not be liable under the policies until a final determination was made in that suit. *Id.*

In the present case, Stewart was never notified by the Plaintiff of any third party bringing a claim against the Plaintiff, the Lender, or Schramm and Baker, asserting an interest to the Property. Instead, the Plaintiff took it upon itself to assert the purported claims of other who have not initiated any action. "A defect in ownership or title is said to exist when the aggregate of rights, privileges, and powers known as ownership is subject to the claims of others." *United States v. City of Flint, Genesee County, State of Mich.*, 346 F. Supp. 1282, 1284 (E.D. Mich. 1972). "These claims may restrict the use and/or alienation of the property and as a corollary may reduce its market value. *Id.* "The policy is written in terms of insuring against loss resulting from 'any defect in or lien or encumbrance on the title.'" *Miller v. Ticor Title Ins. Co.*, 93 P.3d 88, 92 (Or. 2004). "That language requires a title defect, lien, or encumbrance on the property,

9

not a mere claim or an unfounded assertion of one." *Id.* "In other words, a *claim* against the title is not enough." *Id.* (emphasis in original).

Instead of turning over the defense of a third party claim to Stewart, the Plaintiff seeks to assert claims on behalf of itself. In this respect, the Plaintiff intends to try to establish the purported unasserted interests of others, and hired experts to attempt to establish the extent of these unasserted interests. This novel approach does not establish a covered claim under a title insurance policy such as the one in the present case. A title insurance policy is not a first party casualty insurance policy.

In *First Fed.,* the South Carolina Court of Appeals also favorably cited to the First Circuit Court of Appeals' decision in *Falmouth Nat. Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058, 1062 (1st Cir. 1990), which recognized: "[A]n insurer does not guarantee the state of the title, but rather, agrees to indemnify the insured for any loss." "Another distinguishing characteristic of a contract to indemnify is that the loss must be actual; *the mere existence of a defect covered by the policy in and of itself is not sufficient to justify recovery*." *Id.* at 1062-63 (emphasis added).

In this case, the Plaintiff brought suit against Stewart seeking, among other things, a judicial declaration establishing rights in favor of third parties relating to graves and burial sites purportedly located outside of the platted cemetery on the subject Property. Prior to filing this lawsuit, there is no evidence that the Plaintiff ever placed Stewart on notice that any third parties were claiming rights relating to these purported graves and burial sites. Instead, the Plaintiff simply alleges that there were graves and burial sites all over the Property and that this condition rendered the Property valueless. A lenders' title insurance policy indemnifies against the claims of a third party, not claims asserted on their behalf by the property owner. In this respect, the

10

Plaintiff's claim seeks to recover on a theory of guaranty, not indemnity. Consequently, Stewart is entitled to summary judgment on all of the Plaintiff's claims.

**II. Plaintiff failed to produce evidence sufficient to create a genuine dispute of material fact as to whether the Plaintiff suffered an actual loss under the policy because the Plaintiff failed to timely seek a deficiency judgment or attempt to collect on the note. This failure also prejudiced Stewart's subrogation rights under the policy.**

Plaintiff has no right to recovery on the lender's title insurance policy issued by Hearn because the Plaintiff failed to pursue the debt secured by the subject mortgage by collecting on the note or by timely requesting a deficiency judgment against the borrowers. This failure not only negates the Plaintiff's right to recover under the policy but also prejudiced Stewart's subrogation rights under the policy.

"[A] mortgagee-insured's loss cannot be determined unless the note is not repaid and the security for the mortgage proves inadequate." *Falmouth Nat. Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058, 1063 (1st Cir. 1990). "Such is the case because it is only after the insurer or the insured sues on the note and the debtor fails to pay, that the actual loss can be determined." *Id.* "A mortgagee title insurance policy does not guarantee the mortgagee that the mortgagor will make the mortgage payments." *First Fed. Sav. Bank of Brunswick v. Stewart Title Guar. Co.*, 451 S.E.2d 916, 922 (Ct. App. 1994). "The lender, and not the title insurer, shoulders the credit risk in a real estate loan." *Id.* The lender's release of the borrowers from any personal obligation to pay on the note also bars its ability to recover under the policy. *See Stolaruk Corp. v. Cent. Nat. Ins. Co. of Omaha*, 450, 522 N.W.2d 670, 672 (1994) ("Therefore, having breached a condition precedent by absolutely releasing a potential tortfeasor from liability, Stolaruk destroyed Central National's right of subrogation as against Strada and, thus, Stolaruk is barred from pursuing a cause of action on the insurance policy.").

11

In this case, it is undisputed that the Plaintiff failed to seek a deficiency judgment against the borrowers until after the foreclosure. By failing to pursue a deficiency judgment, the Lender effectively released its borrowers and extinguished its contractual rights against them. Under these circumstances, not only has the Plaintiff failed to satisfy a precondition to recovering under the policy, but the Plaintiff has also prejudiced any subrogation rights Stewart may have asserted, barring the Plaintiff from recovering under the policy.

**III. It is undisputed that the final title insurance policy issued by Hearn was an "oversight" that fails to conform to the intent of the parties. The parties agreed to include the Standard Exceptions in the policy. These Standard Exceptions preclude coverage of the Plaintiff's claim.**

Hearn testified that his issuance of the final title insurance policy in this case was an "oversight" on his part. **Ex. A, Hearn Dep. p.109:4-12.** In this respect, Stewart counterclaimed seeking a reformation of the policy to conform to this commitment. **Entry 18.**

"A contract may be reformed on the ground of mistake when the mistake is mutual and consists in the omission or insertion of some material element affecting the subject matter or the terms and stipulations of the contract, inconsistent with those of the parol agreement which necessarily preceded it." *George v. Empire Fire & Marine Ins. Co.*, 545 S.E.2d 500, 504 (S.C. Sup. Ct. 2001). "A mistake is mutual where both parties intended a certain thing and by mistake in the drafting did not obtain what was intended." *Id.*

In this case, Hearn testified the Lender approved a title insurance commitment which contained the following language, characterized in the commitment as the "Standard Exceptions":

> Schedule B of the policy or policies to be issued will contain
> exceptions to the following matters unless the same are disposed of
> to the satisfaction of the Company:
>
> . . .

12

>> b) Easements, or claims of easements, not shown by the public records;
>>
>> c) Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of the premises;
>>
>> . . . ; and
>>
>> f) Restrictions upon the use of the premises not appearing in the chain of title to the land.

**Ex. E, Title Ins. Commitment.** Hearn further confirmed that Stewart required him to add additional exceptions to the commitment prior to the closing, but that he did not issue this commitment until after the closing. **Ex. A, Hearn Dep., pp.100:8-25, 103:2-5.** Regardless, this commitment also included the Standard Exceptions. **Ex. J, Title Ins. Commitment.**

These commitments, taken together, unequivocally show that the parties intended that the final title insurance policy was to include the Standard Exceptions. Hearn characterized his failure to conform the final policy to the commitment issued after closing as an "oversight." **Ex. A, Hearn Dep. p.109:4-12.** Under these circumstances, it is clear the final title insurance policy should be reformed at least to include the Standard Exceptions.

It is also clear that these Standard Exceptions preclude coverage for the claims asserted by the Plaintiff in this case. Initially, to the extent the Plaintiff asserts coverage for easements associated with any graves or burial sites located outside the platted cemetery on the Property, such coverage would be excluded under the first Standard Exception referenced above, for "[e]asements, or claims of easements, not shown by the public records . . . ." **Exs. E & K.**

"The standard easement exception is intended to insulate title insurers from losses resulting from easements that were created as a matter of law and by prescription or implication and that cannot be discovered by searching the public records." 1 Title Ins. Law § 7:12. "In most

13

title insurance policies today, the language of the exception bars coverage of both 'easements and claims of easements not shown by the public record.'" *Id.*

Since the Plaintiff's claims arise from graves and burial sites purportedly located outside the platted cemetery, the Standard Exception for "matters which would be disclosed by an accurate survey and inspection of the premises . . ." also precludes coverage. **Exs. E & K.** "Owners' title insurance policies generally exclude coverage for . . . matters which would be disclosed by an accurate survey and inspection of the premises." *Bennett v. Investors Title Ins. Co.*, 635 S.E.2d 649, 659 (S.C. Ct. App. 2006) (citation omitted). "From a search of relevant public records, a title company cannot ascertain the risks that an accurate survey would disclose." *Id.* "It is for this reason that the title company puts that risk on the insured, who can control it either by obtaining a survey or arranging for the elimination of the survey exception." *Id.* "Thus, the very purpose of a survey exception is to exclude from coverage errors that would be revealed not by a search of public records, but by an accurate survey." *Id.* "[A] legion of case law recognizes title insurance policies using survey exceptions." *Id.*

Finally, to the extent the Plaintiff contends that the policy provides coverage for any loss of use caused by the purported presence of graves outside the platted cemetery, the Standard Exceptions exclude coverage for "[r]estrictions upon the use of the premises not appearing in the chain of title to the land . . . ." **Exs. E & K.**

The parties agreed that the Standard Exceptions should have been included in the final title insurance policy. **Exs. E & K.** Hearn's failure to do so was an "oversight." **Ex. A, Hearn Dep. p.109:4-12.** The Standard Exceptions would preclude coverage for the claims asserted by the Plaintiff. Consequently, Stewart is entitled to summary judgment as to the Plaintiff's claims.

**IV. As a matter of law, a title insurer has no duty to disclose title defects to the insured.**

14

The Plaintiff's bad faith causes of action hinge on a purported duty by Stewart to disclose either the prior litigation involving the Property or that there may be graves and burial sites outside of the platted cemetery.

"The court must determine, as a matter of law, whether the law recognizes a particular duty." *Steinke v. S. Carolina Dept. of Labor, Licensing & Regulation*, 520 S.E.2d 142, 149 (S.C. Sup. Ct. 1999). "If there is no duty, then the defendant in a negligence action is entitled to a directed verdict." *Id.*

"Title insurers do not expressly agree in a Commitment for Title Insurance or in an owner's or loan policy to assume the abstractor's role of searching the chain of title to the property being purchased or accepted as collateral for a loan." 1 Title Ins. Law § 12:3. "Neither does the Commitment, owner's policy, or loan policy expressly assume the attorney's responsibility of disclosing all title defects discovered and explaining their impact to the potential purchaser or lender." *Id.* "Instead, the Commitment simply states that, after closing, the insurer will issue a title policy insuring title in the applicant, subject to standard preprinted exclusions and general exceptions, and subject to the special exceptions that the insurer has typed and attached to the Commitment form." *Id.* "The title insurance policy issued after closing also expressly contracts only to indemnify the insured against loss caused by title defects which are not excluded or excepted." *Id.*

"While the title insurer does list certain defects found in the chain of title being insured, they are listed only as 'Special Exceptions' to the policy's coverage." *Id.* "Neither the preliminary commitment nor the policy state that the title insurer has fully searched the chain of title for the insured's benefit or that the list of special exceptions represents all the defects in the title being insured." *Id.*

15

As previously discussed, South Carolina has joined the many other states which have confirmed that a title insurance policy does not guaranty title. *See First Fed. Sav. Bank of Brunswick v. Stewart Title Guar. Co.*, 451 S.E.2d 916, 921 (S.C. Ct. App. 1994). Since there is no duty for title insurance companies to disclose purported title insurance defects, it is inconsequential whether Sloop's added exceptions placed Hearn and, through Hearn, the Lender, on notice of the possibility of graves and burial sites outside the platted cemetery on the Property. Additionally, since Plaintiff has failed to present a covered claim and Stewart did not breach the policy, there can be no claim for bad faith refusal to pay under the policy. Therefore, Stewart is entitled to summary judgment on the Plaintiff's bad faith claim grounded on a failure to disclose.

## Conclusion

The Plaintiff failed to produce evidence sufficient to create a genuine dispute of material fact on the issue of whether the Plaintiff suffered an actual loss. The Plaintiff bases its recovery under the policy on its own claim against the Property instead an actual claim by a third party. Moreover, the Plaintiff is barred from recovering under the policy by its failure to timely request a deficiency judgment or pursue an action on the note. Instead, the Plaintiff released the borrowers from personal liability, prejudicing both the title insurance claim and Stewart's subrogation rights with respect thereto.

Even if the Plaintiff had established a valid title insurance claim, the type of claim asserted by the Plaintiff is excepted by the Standard Exceptions to the policy, which both parties agreed should have been included in the final title insurance policy.

Finally, Plaintiff's bad faith claim for Stewart's averred failure to disclose the possible presence of graves outside of the platted cemetery fails as a matter of law. Stewart did not breach the policy, nor did it undertake a duty to disclose possible title insurance defects to the Lender.

For the foregoing reasons, Stewart respectfully requests that the Court GRANT its motion for summary judgment.

                    Respectfully Submitted,

                    PRATT-THOMAS WALKER, P.A.


                    s/Daniel S. McQueeney, Jr.
                    G. Trenholm Walker (Fed ID #4487)
                    Daniel S. McQueeney, Jr. (Fed ID #9987)
                    P.O. Drawer 22247
                    Charleston, SC 29413-2247
                    Tel: 843-727-2200
                    Attorneys for Defendant

April 25, 2012